**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 6, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

JACOB McGEHEE; STEVEN RAY
HEATH,

     Plaintiffs - Appellants,

v.

FOREST OIL CORPORATION;
LANTERN DRILLING COMPANY,

     Defendants - Appellees,

and

SOUTHWEST ELECTRONIC ENERGY
CORPORATION,

     Defendant Third-Party Plaintiff,

v.

ENGINEERED POWER LP;
TELEDRIFT, INC.,

     Third-Party Defendants.

No. 17-6238

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:15-CV-00145-C)**
_____

Reggie N. Whitten (Michael Burrage and J. Revell Parrish with him on the briefs), of
Whitten Burrage, Oklahoma City, Oklahoma, for Plaintiffs - Appellants.

Clark W. Crapster of Steidley & Neal, P.L.L.C, Tulsa, Oklahoma, for Defendants - Appellees.

_____

Before **BRISCOE**, **LUCERO**, and **MATHESON**, Circuit Judges.

_____

**MATHESON**, Circuit Judge.

_____

Plaintiffs Jacob McGehee and Steven Ray Heath appeal the district court's grant of summary judgment to defendants Forest Oil Corp. and Lantern Drilling Co.[1]  Forest and Lantern leased a drilling device from Teledrift, the plaintiffs' employer, and returned the device after using it in drilling operations.  Plaintiffs then proceeded to clean and disassemble it.  Mr. McGehee discovered that, in addition to mud and other debris, several small bolts had fallen into the device.  While he attempted to remove these materials, the lithium battery inside the device exploded, injuring himself and Mr. Heath.  They sued Forest and Lantern for negligently causing the explosion by allowing bolts to fall into the device.  Following discovery, Forest and Lantern moved for summary judgment, which the district court granted, holding they did not owe the plaintiffs a duty of care under Oklahoma tort law.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

_____

[1] According to the Petition that commenced this case in state court, Forest and Lantern "were engaged in a partnership whereby they shared the right to control the business and shared in all the profits and losses of the business."  Petition ¶ 43, ROA, Vol. I at 34.  The parties treat Forest and Lantern as acting in concert as to all matters relevant to the issues presented in this appeal.

2

## I.  BACKGROUND

### A.  *Factual Background*

Forest and Lantern leased a drilling device from Teledrift.  The plaintiffs' expert,

Joseph D. Jolson, submitted a report that described the device as follows:

> From about 2004 - 2008, Teledrift and an acquired company's engineers designed the Proshot; a measurement while drilling (MWD) tool that uses wireless positive mud pulsing technology to provide inclination and azimuth measurements to workers at the well surface during vertical downhole drilling.  Teledrift and the acquired company's design team knew Excell and [Southwest Electronic Energy Corporation ("SWE")] as designers and manufacturers of the lithium-thionyl chloride cell containing battery packs used to power MWD tools.  Both companies were asked to design battery packs for the Proshot MWD tool.  Excell was chosen as the initial manufacture[r].
>
> The Proshot MWD tool's cylindrical battery pack contains six spirally-wound, high-rate, high-capacity DD, lithium-thionyl chloride cells arranged in series.  To make a Proshot MWD tool battery assembly, the battery pack is slipped inside a copper-beryllium tube with a wall thickness of almost 0.2 inches.  Bulkheads at each end of the copper-beryllium tube keep the battery pack in place and allow electrical connection to the instrument package.  The Proshot's battery assembly is approximately 4½ feet long.
>
> The Proshot MWD tool instrument package is approximately 3-feet long.  It has a valve body with a diameter of about 4½ inches which becomes one end of the fully assembled Proshot MWD tool.  Near the valve body is the locking collar.  When the Proshot instrument package is connected to the battery assembly, the Proshot MWD tool is 89.85 inches long.  The centralizer has a diameter of about 3½ inches and is the part of the battery assembly furthest from the valve body.  Between the valve body and the centralizer, the diameter of the Proshot MWD

3

tool is mostly much smaller than 3½ inches with the locking collar having the largest diameter.

Before shipment to a drill site, Teledrift connects the Proshot's instrument package to a battery assembly. The Proshot MWD tool's valve body is inserted into the box end of the cylindrical drill collar which has an opening of about 4¾ inches. It is pushed further in until it comes to rest on a shoulder at the pin end of the drill collar which has an opening of about 2½ inches.

The length of the resulting drill collar assembly can range from 10 to 16 feet. For most of the Proshot MWD tool's length, there is a gap between its outside diameter and the inside diameter of the drill collar. When the drill collar assembly is downhole, the Proshot MWD tool is vertical and the battery assembly is above the instrument package. During drilling, lubricating mud or lubricating mud mixed with loss circulation material (LCM) is forced into the opening at the box end of the drill collar. The mud or mud/LCM mixture travels down the gap between the battery assembly and drill collar, reaches the instrument package, passes the narrowing gap at the locking collar, slips through holes in the Proshot's valve body and exits at the pin end of the drill collar assembly.

ROA, Vol. I at 137. In their opposition to summary judgment, the plaintiffs submitted the following diagram and photograph of the ProShot MWD. ROA, Vol. II at 190-91.

4

# THE MWD TOOL





**Figure 3:** Exemplar Teledrift ProShot (on floor) and sub or drill collar (on stand)

As described by Dr. Jolson and as depicted above, the ProShot Measurement While Drilling ("ProShot MWD" or "ProShot") tool, when fully assembled, includes a valve body, a paddle, a locking collar, a lithium battery, a piston, a centralizer, and a

debris catcher. This assembly fits into a cylindrical drill collar, also called a drill pipe or "sub." ROA, Vol. I at 145-46.

In addition to the foregoing names of the ProShot MWD collar assembly parts, this opinion uses terms related to the drilling operator's use of the tool. The "drill hole" is the hole in the ground where the drill pipe containing the ProShot assembly is inserted. "Downhole" refers to the shaft of the "drill hole." Thus, mud or rocks falling "downhole" necessarily drop into the "drill hole," and may also fall into the "drill pipe" containing the ProShot assembly, including the lithium battery.

The terms "debris catcher" and "drill screen" (or "debris screen") appear in the record without much explanation or discussion. We understand "debris catcher" to be a part of the ProShot MWD assembly that sits on top of the ProShot tool and is placed along with the tool inside the drill pipe (or collar). We understand "drill screen" to be an item that is used to prevent debris from falling into the drill hole.

Oil and drilling companies use the ProShot MWD to guide the drilling process by sending information to the controllers at the surface level. Mud and rocks frequently enter the drill collar assembly during the tool's use. After the device is returned, Teledrift cleans and disassembles it by pulling the ProShot MWD tool from the drill collar. Mud and rocks lodged inside the collar frequently can impede removal of the ProShot. Teledrift employees use various methods to extract the ProShot.

Mr. McGehee and Mr. Heath worked for Teledrift. Their jobs included disassembling the ProShot devices when they were returned after use. In this case,

6

having received the drilling device from Forest and Lantern, the Teledrift crew consisting of Mr. McGehee, who was the foreman, and Mr. Heath and Charles Wheeler, commenced the process to remove the ProShot MWD tool from the drill collar (or drill pipe). Mr. McGehee sprayed water into the collar to loosen mud. Then he used a pulling tool to remove the ProShot, but it was stuck. He continued to spray water into the collar and observed three or four bolts come out. He then tapped the valve body inside the collar with a 125-pound metal rod to dislodge the ProShot, a method he had used before.

Mr. McGehee struck the valve body in this manner approximately 120 times after spraying water to loosen dried mud. After about 30 minutes of work to remove the ProShot from the collar, the ProShot's lithium battery pack exploded, injuring Mr. McGehee and Mr. Heath, who was standing nearby. Mr. Wheeler was not injured. No evidence was adduced that Forest or Lantern knew that bolts had dropped into the drilling device. *See* Oral Arg. at 3:36-4:02.

## B. *Procedural Background*

Mr. McGehee and Mr. Heath filed an action in the Oklahoma State District Court of Cleveland County. They alleged that at least one of the bolts inside the drilling device compromised the lithium battery pack and caused the explosion. They further alleged that Forest and Lantern negligently allowed the bolts to fall downhole, resulting in the explosion and their injuries. The case was removed to the Western District of Oklahoma under 28 U.S.C. §§ 1332, 1441, and 1446.

7

After the parties completed discovery, Forest and Lantern moved for summary judgment, which the district court granted, holding that Forest and Lantern did not owe a duty of care to the plaintiffs. It relied on *Beugler v. Burlington Northern & Santa Fe Railway Co.*, 490 F.3d 1224 (10th Cir. 2007). In *Beugler*, Burlington Northern & Santa Fe ("BNSF") had lowered a crossing gate to repair a broken rail. *Id.* at 1229. When the plaintiff, a Union Pacific Railroad employee, lifted the gate for traffic to pass by, he turned toward a honking truck and injured his neck. *Id.* at 1226-27. He sued BNSF for negligence. We affirmed summary judgment for BNSF, holding that BNSF did not owe a duty to the plaintiff under Oklahoma law. Because the plaintiff had been trained to lift crossing gates and had done so many times, we said this was an "ordinary and unforeseeable work injury" that occurred in the "course of performing [plaintiff's] professional duties." *Id.* at 1228-29.

In this case, the district court pointed out that, similarly to the plaintiff in *Beugler*, Mr. McGehee and Mr. Heath were engaged in a normal work duty. That is, after Forest and Lantern had used the drilling device and returned it to Teledrift, they attempted to remove the ProShot from the collar as they had done many times before. The court concluded that Oklahoma law "simply does not extend the foreseeable zone of risk, and therefore a duty of care, to Plaintiffs in this case." *McGehee v. Sw. Elec. Energy Corp.*, No. CIV-15-145-C, 2017 WL 3088400, at *3 (W.D. Okla. July 20, 2017).

The district court distinguished *Delbrel v. Doenges Brothers Ford, Inc.*, 913 P.2d 1318 (Okla. 1996), the case Mr. McGehee and Mr. Heath principally relied on to oppose

8

summary judgment. In *Delbrel*, the Oklahoma Supreme Court held that a car dealership owed a duty of care to members of the general public based on foreseeable harm from faulty car repair. *Id.* at 1321-22. The district court here said *Delbrel* does not apply to this case because "[d]efendants paid Teledrift to deliver a safe tool, not the reverse." *McGehee*, 2017 WL 3088400, at *2. In other words, the district court found that Teledrift was more akin to the car dealership than Forest or Lantern.

After denying plaintiffs' motion to alter or amend judgment under Federal Rule of Civil Procedure 59(e), the district court granted their motion to certify the summary judgment order for appeal under Fed. R. Civ. Proc. 54(b). Plaintiffs timely appealed.

## II. **DISCUSSION**

### A. *Standard of Review and Applicable Law*

We review the district court's grant of summary judgment de novo. *Knopf v. Williams*, 884 F.3d 939, 946 (10th Cir. 2018). A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party. *Knopf*, 884 F.3d at 946.

We apply Oklahoma law because, in a federal court diversity case, "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the [forum] state." *Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938); *Cohen–Esrey Real Estate Serv., Inc. v. Twin City Fire Ins. Co.*, 636 F.3d 1300,

9

1302 (10th Cir. 2011).  We give no deference to the district court's interpretation of state law.  *Wade v. Emcasco Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007).

## B. *Legal Background*

To prove a negligence claim under Oklahoma law, the plaintiff must show duty, breach, and causation—(1) a duty owed by defendant to protect plaintiff from injury, (2) defendant's failure to properly exercise or perform that duty, and (3) defendant's failure to exercise his duty of care proximately caused plaintiff's injury.  *John v. St. Francis Hosp., Inc.*, 405 P.3d 681, 691 (Okla. 2017); *see Nicholson v. Tacker*, 512 P.2d 156, 158 (Okla. 1973).  Because the district court granted summary judgment based on lack of a duty, we focus on that issue here.

Whether a duty exists is a threshold legal question for the court.  *Delbrel*, 913 P.2d at 1320; *Wofford v. E. State Hosp.*, 795 P.2d 516, 518 (Okla. 1990).  "[T]he existence of a duty depends on the relationship between the parties and the general risks involved in the common undertaking."  *Wofford*, 795 P.2d at 519.  A duty may be based on a contract, special relationship, or general negligence principles.  *Lowery v. Echostar Satellite Corp.*, 160 P.3d 959, 964 (Okla. 2007).  In their attempt to

10

establish that Forest and Lantern had a duty of care to them, Mr. McGehee and Mr. Heath rely on general negligence principles.[2]

In *Lowery*, the Oklahoma Supreme Court declared that a duty arises "whenever the circumstances place [one] in a position towards [another] person such that an ordinary prudent person would recognize that if he or she did not act with ordinary care and skill in regard to the circumstances, he or she may cause danger or injury to the other person." 160 P.3d at 964 (citing *Lisle v. Anderson*, 159 P. 278 (Okla. 1916)); *see also Iglehart v. Bd. of Cty. Comm'rs of Rogers Cty.*, 60 P.3d 497, 502 (Okla. 2002). It further said, "The most important consideration" is "foreseeability of harm to the plaintiff." *Lowery*, 160 P.3d at 964; *see also Delbrel*, 913 P.2d at 1321.[3]

A foreseeable risk of harm alone is not enough to establish a duty of care under Oklahoma law. The plaintiff must be "foreseeably endangered by defendant's

---

[2] Under Oklahoma law, "[e]very person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights." Okla. Stat. Ann. tit. 76, § 1.

[3] The Oklahoma Supreme Court has identified other factors, including the "degree of certainty of harm to the plaintiff, moral blame attached to defendant's conduct, need to prevent future harm, extent of the burden to the defendant and consequences to the community of imposing the duty on defendant, and availability of insurance for the risk involved." *Lowery*, 160 P.3d at 964 n.4 (numbering scheme omitted). To establish duty, Mr. McGehee and Mr. Heath rely only on foreseeability.

11

conduct *with respect to all risks that make the conduct unreasonably dangerous*."

*Lowery*, 160 P.3d at 964 (emphasis added); *see also Beugler*, 490 F.3d at 1229 (same

standard) (citing *Iglehart*, 60 P.3d at 502).  Oklahoma courts use this formulation to

determine the "zone of risk." *Lowery*, 160 P.3d at 964.[4]  Within that zone, a

"defendant owes a duty of care to all persons who are foreseeably endangered by his

conduct with respect to all risks which make the conduct unreasonably dangerous."

*Wofford,* 795 P.2d at 519.[5]

---

[4] Oklahoma courts have recognized the difference between foreseeability as a factor for duty of care and foreseeability as it relates to proximate cause, which concerns whether the defendant's conduct foreseeably and substantially caused the injury.  *See Delbrel*, 913 P.2d at 1322; *McClure v. Sunshine Furniture*, 283 P.3d 323, 329 (Okla. Civ. App. 2012).  In *Iglehart*, the court, having found a duty of care as a matter of law based on foreseeability, next found a disputed issue of material fact regarding foreseeability of the breach of that duty and reversed summary judgment on that ground.  60 P.3d at 502-05.

[5] As Prosser and Keeton have explained, "[I]n negligence cases, the duty is always the same—to conform to the legal standard of reasonable conduct in light of the apparent risk."  W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 53, at 356 (5th ed. 1984).  Moreover, negligence "necessarily involves a foreseeable risk, a threatened danger of injury, and conduct unreasonable in proportion to the danger.  If one could not reasonably foresee any injury as the result of one's act, or if one's conduct was reasonable in light of what one could anticipate, there would be no negligence, and no liability."  *Id.* at § 43, at 280.  Other commentators have explained that "liability is not imposed unless harm would have been foreseeable to a reasonable person—and not only foreseeable but recognizable as unreasonably probable."  Dan B. Dobbs et al., The Law of Torts § 256 (2d ed.) (June 2018 update).

12

Accordingly, under the *Lowery/Wofford* "zone of risk" standard, if a risk of harm was foreseeable but the risk did not make the defendant's conduct unreasonably dangerous, no duty of care will be found. *See Lowery*, 160 P.3d at 965-66; *Beugler*, 490 F.3d at 1229 ("foreseeability inquiry" must be "tether[ed]" to "the anchor the Oklahoma Supreme Court has specified: the 'risks which make the conduct unreasonably dangerous.'" (quoting *Iglehart*, 60 P.3d at 502)).[6] "And, if the defendant did not owe a duty of care to the plaintiff, there can be no liability for the negligence as a matter of law." *Lowery*, 160 P.3d at 964 (citing *First Nat'l Bank in Durant v. Honey Creek Entm't Corp.*, 54 P.3d 100 (Okla. 2002)).

A brief review of Oklahoma cases applying this duty-of-care standard informs our analysis.

In *Lowery*, the Oklahoma Supreme Court held, under the facts of that case, a foreseeable risk of harm was not unreasonably dangerous and granted summary judgment to the defendant based on the lack of a duty of care. The plaintiff, Ms.

---

[6] "[T]o protect the traditional function of the jury as factfinder," the Third Restatement of Torts disapproves of using foreseeability to determine whether there is a duty of care. Restatement (Third) of Torts § 7 cmt. j (Am. Law Inst. 2010); *see generally* Benjamin C. Zipursky, *Foreseeability in Breach, Duty, and Proximate Cause*, 44 Wake Forest L. Rev. 1247 (2009). But "some courts have imported considerations of foreseeability into the process of deciding whether a defendant has a duty to exercise care." Dan B. Dobbs et al., The Law of Torts § 256 (2d ed.) (June 2018 update). As described above, that is what the Oklahoma courts have done.

Lowery, sued Dish Network when she fell from her roof while attempting to fix the satellite dish that Dish had previously installed. *Lowery*, 160 P.3d at 962. Dish had refused to make minor repairs, and, over the phone, had directed the plaintiff on how to do the repairs herself by climbing on the roof to reach the dish. *Id*.

Ms. Lowery argued that Dish Network assumed a duty of care when it refused to make the repair and instructed her on how to do it. *Id*. at 965. The court rejected this argument. *Id*. Although Dish could foresee a risk of harm in instructing Ms. Lowery to climb onto the roof, it did not "unreasonably endanger[] [Ms.] Lowery with respect to the obvious risk involved in climbing onto a rooftop." *Id*.[7] The record presented no evidence that "would lead a reasonable prudent person to view Dish Network's customer service conduct, its acts or omissions, as unreasonably endangering Lowery and placing a duty upon Dish Network . . . ." *Id*.[8] Finding no

_____

[7] "The focus of our inquiry is not whether the risk of harm was foreseeable but whether Dish Network's conduct unreasonably endangered Lowery with respect to the obvious risk involved in climbing onto a rooftop." *Lowery*, 160 P.3d at 965.

[8] The court added:

> To prevent summary judgment, Lowery needed to produce evidentiary materials showing that the Dish Network customer service employee knew or should have known of some danger of harm with respect to the obvious risks of climbing onto a rooftop, such as, precarious location of the satellite dish or precarious height or pitch of the roof, absence of an intelligent choice to climb to the roof, physical inability to climb a ladder, or a myriad of other

14

sufficient foreseeability of harm with respect to an unreasonable danger, the court did not address other policy factors associated with determining duty of care.

By contrast, Oklahoma courts have found a duty of care when the defendant's alleged negligence has created a foreseeable risk of harm to motorists on public roadways. For example, in *Delbrel*, the Oklahoma Supreme Court found that a car dealership had a duty of care to a plaintiff who claimed he was injured due to the dealership's alleged negligent repair of a vehicle. 913 P.2d at 1319. The plaintiff was a passenger in the vehicle, which had stalled on a public roadway. When the plaintiff was helping the driver to push the vehicle off the road, another vehicle hit him from behind, causing significant injuries. The court held that "one who is paid to repair a car owes a duty of care to both the owner of the car and to the general public to assure that the repair is properly performed or the owner is warned of its dangerous condition, where the dangerous condition is discoverable in the exercise of ordinary care." 918 P.2d at 1322.

Again, in *Iglehart*, the Oklahoma Supreme Court said a utility company owed a duty of care to motorists when it was foreseeable that the company's alleged negligent tree maintenance posed a danger to motorists. 60 P.3d at 500. The court

---

> possible facts which might lead a reasonable prudent
> person to view the conduct of the customer service
> employee to be unreasonably dangerous.

*Lowery*, 160 P.3d at 965.

15

said the duty is owed to everyone "foreseeably endangered" as to "all risks which make the conduct unreasonably dangerous." *Id.* at 502 (quoting *Wofford*, 795 P.2d at 519).

Finally, in *McClure*, the Oklahoma Court of Civil Appeals also found a duty. 283 P.3d at 329. The defendant furniture company had failed to secure boxes of chairs that it had reloaded onto a pick up truck. The chairs fell off the truck, causing an accident and injury to a motorist. Applying the foreseeability standard that extends the "zone of risk" to risks that make the defendant's conduct unreasonably dangerous, the court found a duty because it was "foreseeable that other motorists could be harmed by improper loading of [the] truck." *McClure*, 283 P.3d at 329.

## C. *Analysis*

We affirm the district court's grant of summary judgment. Assuming they allowed bolts to fall into the drilling device, Forest and Lantern created a risk of harm. They may also have created a foreseeable risk of harm to Teledrift employees who would disassemble the device containing the ProShot MWD. But creating a foreseeable risk of harm does not necessarily establish a duty of care under Oklahoma law. *See Lowery*, 160 P.3d at 965 (stating that "[t]he focus of our inquiry is not whether the risk of harm was foreseeable but whether [the defendant's] conduct unreasonably endangered [the plaintiff]"); *Nicholson*, 512 P.2d at 159-60 (stating that defendant who created a danger is not per se negligent, especially when danger is obvious and plaintiff was aware of it).

16

One possible ground to affirm the district court's grant of summary judgment is to regard the particular risk—that at least one of the bolts could cause the lithium battery powering the ProShot to explode—as not reasonably foreseeable. But we think affirmance is more soundly based on applying the *Wofford/Lowery* Oklahoma duty-of-care standard.[9] That standard locates within the foreseeable zone of risk only those risks that make the defendant's conduct unreasonably dangerous. As applied here, because it was common for debris to fall into the drilling device during its use in the field, and because users like Forest and Lantern returned the device for Teledrift to clean out mud and rocks, disassemble the device, and prepare it for its next use,[10] the defendants did not engage in conduct that created an unreasonably

---

[9] Defendants Forest and Lantern argue they had no duty of care to Mr. McGehee and Mr. Heath because they could not have reasonably foreseen that failure to prevent bolts from dropping into the drilling device posed a risk of harm from an exploding lithium battery located within the ProShot. Aplee. Br. at 25-26. A sentence in *Lowery* appears to provide support: "We have explained that a duty of care may arise from a set of circumstances which would require the defendant to foresee *the particular harm* to the plaintiff." 160 P.3d at 694 (emphasis added). This passage suggests that the specific harm—here the exploding lithium battery—must have been reasonably foreseeable to Forest and Lantern for them to have a duty to the plaintiffs.

We are reluctant, however, to rely on this ground because the Oklahoma Supreme Court has used broader language than it did in *Lowery* to describe the foreseeability standard. For example, in *Wofford*, the court said that a "defendant owes a duty of care to all persons who are foreseeably endangered by his conduct *with respect to all risks* which make the conduct unreasonably dangerous." 705 P.2d at 518 (emphasis added) (quotations omitted).

[10] At his deposition, Mr. McGehee referred to a ProShot collar assembly that has been returned from the field as "a dirty sub, as we call it." ROA, Vol. I at 76.

17

dangerous foreseeable risk to Mr. McGehee and Mr. Heath. Accordingly, Forest and Lantern did not owe a duty of care to the plaintiffs, and summary judgment was appropriately granted.

To establish a duty of care, Mr. McGehee and Mr. Heath needed to show that Forest and Lantern "knew or should have known of some danger of harm . . . which might lead a reasonable prudent person to view the conduct . . . to be unreasonably dangerous." *Lowery*, 160 P.3d at 965. They have not done so. Forest's and Lantern's conduct was not unreasonable under a reasonably prudent person standard. They leased the drilling device. Debris could and did fall into the device when it was used. Lessors like Forest and Lantern frequently returned the device to Teledrift with mud and rocks inside.[11] Teledrift employed Mr. McGehee and Mr. Heath to remove the debris and to disassemble the ProShot from the collar.

Even though Forest and Lantern might have been able to foresee that debris lodged in the collar could pose a risk to Teledrift employees who were tasked with cleaning and disassembling the device, returning the ProShot with that knowledge was not unreasonable under these circumstances. This is especially so when the record lacks evidence that Forest and Lantern had any knowledge of bolts having

---

[11] Mr. McGehee testified that "mud" and "particles" "do get in there." ROA, Vol. I at 78.

fallen into the collar.

The record evidence about the bolts cuts in Forest's and Lantern's favor. Mr. McGehee, by his own account, encountered three to four bolts when attempting to remove the ProShot from the collar and thus was aware that bolts had been lodged inside. He nonetheless continued to attempt to remove the ProShot by hitting the valve body with the metal rod.

Neither Mr. McGehee nor Mr. Heath stopped disassembly operations when the bolts were found, evidencing that, as in *Beugler*, it was their job to remove debris, including bolts, and disassemble the device in the normal course. Whatever foreseeable risk the return of the device may have posed to Teledrift's employees, to conclude that Forest and Lantern should have known that their conduct posed an unreasonably dangerous risk to Mr. McGehee would be "beyond reason and good sense." *Rose v. Sapulpa Rural Water Co.*, 631 P.2d 752, 757 (Okla. 1981).

Mr. McGehee's and Mr. Heath's remaining arguments to avoid this conclusion are unavailing.

First, Mr. McGehee and Mr. Heath argue that the deposition testimony of Bryan James "BJ" Pool, Forest's and Lantern's corporate representative under Federal Rule of Civil Procedure 30(b)(6), established a duty of care. Aplt. Br. at 10. Mr. Pool testified it was "common knowledge" that drilling operators like Forest and Lantern should try to prevent debris from falling into the drill hole and that this was

19

akin to knowing that "[w]e don't want the rig to fall over." ROA, Vol. II at 269. He further said that "we would take precautions to make sure something didn't fall in the hole" and that "it's everybody on site's responsibility to make sure nothing falls down the hole." *Id.* at 269-70, 273. Mr. McGehee and Mr. Heath contend this evidence is similar to the furniture company president's statement in *McClure* that his company was aware that injuries could occur when furniture is loaded improperly. Aplt. Br. at 14-15; *see* 283 P.3d at 329. The *McClure* court concluded the company's knowledge of this danger established that the furniture business had a duty of care to the plaintiff motorist. *McClure*, 283 P.3d at 329.

Assuming that Mr. Pool's statements concerned safety as opposed to addressing only the facilitation of drilling operations, his testimony about use of a drilling screen nonetheless did not establish a duty. It may describe a preferred or best practice in the drilling field. But as explained previously, drilling operators routinely returned the drilling device to Teledrift with mud and rocks inside, knowing that Teledrift cleans, disassembles, and reassembles the tool for its next use. Even if the used device presented a foreseeable risk of harm to Teledrift employees, it was not a risk that made the defendant's conduct unreasonably dangerous in light of the drilling operators' understanding of Teledrift's disassembly and cleaning procedure that follows the return of the device after its use. As stated in *Wofford*, "[t]he existence of a duty depends on the relationship between the parties and the general risks involved in the common undertaking." 795 P.3d at 519.

20

Second, Mr. McGehee and Mr. Heath point to their oilfield drilling expert, Richard (Rick) Johnson, Aplt. Br. at 10-11. His report opined that "it is inexcusable and careless for a company to allow debris to fall down an open drill hole or drill pipe" and that it is "inexplicable and careless for a company to not use appropriate debris screens during operation." ROA, Vol. II at 307. This opinion might support the breach-of-duty element of a negligence claim, but not whether there was a duty-of-care legal obligation. *See Delbrel*, 913 P.2d at 1321-22 (distinguishing between duty of care and breach of duty).[12] Similarly, although the record does not show whether drill screens were used to stop debris, Aplee. Br. at 22,[13] the presence

_____

[12] "It is better to reserve 'duty' for the problem of the relation between individuals which imposes upon one a legal obligation for the benefit of the other, and to deal with particular conduct in terms of a legal standard of what is required to meet the obligation." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 53, at 356 (5th ed. 1984).

We note that the negligence claim against Forest and Lantern in the plaintiffs' Petition alleges "negligence," "proximate cause," "injuries," "fail[ure] to use reasonable care," "breaches," and "damages," but it does not mention "duty of care," an essential element of an Oklahoma negligence claim. Petition ¶¶ 39-41, ROA, Vol. I at 33; *see Nicholson*, 512 P.2d at 159-60.

[13] Mr. McGehee and Mr. Heath, citing to Mr. Pool's deposition, assert that Forest and Lantern "did not use certain equipment, such as drill screens, to prevent debris from falling downhole." Aplt. Br. at 4. But Mr. Pool's testimony was inconclusive on this point:

> Q. Do you know if they had a screen out there on this occasion?
>
> A. No. It's – it's not written in the report.

21

or absence of a drill screen would also go to breach rather than duty. Nor does the record show that Forest and Lantern knew that bolts had fallen into the drill pipe.[14] Finally, this argument again does not overcome the need to show that, to the extent there was a foreseeable risk of harm, it was situated in the zone of risk that made the defendants' conduct unreasonably dangerous.

Third, Mr. McGehee's and Mr. Heath's reliance on cases like *Delbrel*, *Iglehart*, and *McClure*, each recognizing that the plaintiff owed a duty of care to motorists on public roads, is misplaced. In each instance, the plaintiff alleged that the defendant had a duty of care because the defendant's carelessness—faulty car repair, poor tree maintenance, and improper furniture loading—placed the general public at a foreseeable risk of harm, a risk that made the defendants' conduct

---

       Q. Okay.

       A. If I had to guess, I would say it would be, but –

       Q. But you don't know as you sit here.

       A. I don't know.

ROA, Vol. II at 272. Mr. Johnson's report states there was "no evidence that the screens were utilized by the operator," *id.* at 307, but, as per Mr. Pool's deposition, the record lacked evidence that they were not used.

[14] Mr. Johnson opined that "it is incumbent for the contractor to notify the operator that debris fell in the open hole or in the drill pipe and what the debris is and the nature of the same." ROA, Vol. II at 307. But, as noted above, the record lacks evidence that Forest or Lantern knew that bolts had fallen into the drill pipe.

unreasonably dangerous. Here, after Forest and Lantern used the ProShot in drilling operations, they did not pass on the contaminated device to another drilling operator for further use, nor did they arrange for the device to be cleaned and disassembled by someone who lacked knowledge that mud and rocks frequently find their way inside. They instead returned it, knowing that Teledrift employees routinely removed mud and debris from the device after it had been used. Mr. McGehee and Mr. Heath may have faced a risk in performing this function, but not a risk that was the product of unreasonably dangerous conduct on the part of Forest and Lantern.

## III. CONCLUSION

We affirm the district court's entry of summary judgment in favor of Forest and Lantern.